UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


ALLEN BAISDEN and ANGEL D. BAISDEN,
husband and wife,

          Plaintiffs,

v.                                    Civil Action No. 2:11-079

ALPHA & OMEGA COAL COMPANY, LLC,

          Defendant.


MEMORANDUM OPINION AND ORDER


          Pending is defendant's motion for summary judgment,

filed November 14, 2011.[1]  For the reasons set forth below,

defendant's motion is granted.


I.  Background


          This is a deliberate intent action in which plaintiffs

Allen and Angel Baisden seek to recover damages from defendant

Alpha & Omega Coal Company, LLC ("Alpha"), for injuries

sustained by Mr. Baisden in an underground coal mining accident

that occurred at Alpha's No. 2 Mine on October 24, 2009, and for

_____

          [1] On January 26, 2012, the parties filed a stipulation of
voluntary dismissal with prejudice of defendant Wayco Limited
Partnership No. 1.

Mrs. Baisden's derivative loss of consortium.  The following factual recitation on this motion is taken in the light most favorable to plaintiffs.

Mr. Baisden was formerly employed as a roof bolting machine operator at Alpha's No. 2 mine located in Mingo County, West Virginia.  (Pl.'s Mem. 1).[2]  He had over four years of roof bolting experience.  (Def.'s Mot., Ex. 1, ¶ 23; F. Collins Dep. 9).  At the time of the accident, Mr. Baisden was operating a roof bolting machine manufactured by J.H. Fletcher & Company ("Fletcher").  (Pl.'s Mem. 1).  Alpha utilized two Fletcher roof bolting machines in the No. 2 mine.  (Farley Dep. 16:1).  These bolters were nearly identical, except that one had caterpillar tracks while the other used rubber tires.  Employees referred to the caterpillar bolter as the "cat bolter" and the rubber tire bolter as the "tire bolter."  (Id.).  The Fletcher bolters each had two operator stations that allowed two workers to operate two different drill "pots" or drilling mechanisms simultaneously.  Employees referred to the side with the

---

[2] A roof bolter is a machine that secures bolts in the roof of an underground mine in order to support and stabilize the ceiling.

controls as the "operator's side" and the other side as the "offside."  (Def. Mem. 2).  At all relevant times, Mr. Baisden utilized the operator's side of the cat bolter during the actual roof bolting process.  (F. Collins Dep. 9).

        The cat bolter had a protective metal canopy designed to shield operators from incidental slippage or fall of draw rock that may occur during the process of bolting.  (R. Farley Dep. 26:15).  The canopy sets above the work platform and can be raised and lowered by the operator according to the employees' height and work conditions.  (Id. 30:14; Video of subject roof bolter (Oct. 12, 2011) ("Roof Bolter Video")).  Employees raise and lower the canopy using hydraulic levers.  (R. Farley Dep. 30:18; Roof Bolter Video).  The post holding the canopy is described as being like a vertically extending "radio antenna" with two stages or sections.  (C. Brown Dep. 15:6).  Together, the extendable post sections and attached canopy are referred to as the "canopy post."  As the canopy post is raised and lowered, the two different stages of smaller post sections extend out in an upward motion and then back in.  (Id.).  The canopy rests on top of the smaller post section that fits snugly within a larger post section that in turn fits within a fixed base.  The outermost or base post is square.  It also acts as a casing for

3

the circular hydraulic jack that sits inside it.  (Id. 16:1).
In other words, the lower portion of the square-shaped post is
the largest portion from which the smaller square-shaped post
sections extend.  (Pl.'s Mem. 2; Roof Bolter Video).  When fully
extended, the two upper sections of the post are fully exposed.
When completely withdrawn downward, the two upper sections of
the post are designed to fit within the base section of the
post.

        Assuming the bolter is manufactured and maintained
properly, the operator can hold the valve lever in the "up"
position and the canopy post will reach the maximum point of
extension.  When the valve lever is released, the lever returns
to the neutral position, and the canopy post ceases movement.
(Roof Bolter Video; Hinshaw Dep., 27-28, 32-33, 35).  There is
some question as to the prudence of continuing to hold the lever
in the "up" position even after the canopy post reaches its
greatest point of extension, inasmuch as doing so is thought by
several workers to increase the potential for overextension.

        If the canopy post is not properly maintained -- or
according to some testimony, not operated properly -- the
smaller sections of the canopy post can be pushed beyond the

4

larger base section, causing the post to overextend.  (Id. 24, 38-39).  This overextension results in the canopy turning to a position that no longer protects the machine operator.  The mechanism within the canopy post which prevents the overextension is twofold.

First, the canopy post contains replaceable shims or brass bushings[3] designed to prevent or impede the overextension of the canopy post and lubricate the interior metal parts.  (Id.; R. Farley Dep. 33:17).  The bushings are made of softer brass and are designed to wear to prevent damage to the other parts of the canopy post.  (Id. 31:23).  Workers at the mine knew when it was time to replace the bushings because the canopy post would lean, though it is unclear to what degree it would lean.  (R. White Dep. 18:18; J. Davidson Dep. 17:2). Regardless, defendant points out that the retainer that held the bushings was often not strong enough in all circumstances to completely stop the canopy post from overextending, especially when the operator continued to keep the hydraulic lever in the "up" position even after the canopy was fully extended.  (R.

---

[3] The record indicates that the replaceable shims are also referred to as "brass bushings," "bushings" or simply "brass." The court employs the term "bushings" for consistency.

Farley Dep. 33:4; R. White Dep. 17:14; E. Collins Dep. 26:13).
Second, the canopy post also contains permanent bushings which,
when worn out, can only be repaired by replacement of the entire
canopy post, including the fixed base. (Hinshaw Dep. 24, 38-
39).

       In this case, plaintiffs assert that the canopy post
on the operator's side overextended on previous occasions
despite replacement of the replaceable bushings. (F. Collins
Dep. 10-11; R. White 14-15; E. Collins Dep. 21; D. Collins Dep.
23). Rather than replace the entire canopy post, as plaintiffs
maintain should have been done, defendant welded chains
extending from the smallest post section to the base of the
canopy post. The chains connected the base post to the top.
Even so, if an operator kept the lever in the "up" position, the
hydraulic pressure could be strong enough to break the chains.
(R. Farley Dep. 68-69). Defendant strenuously contends that the
chains were not meant to replace the role of the worn bushings,
but rather to supplement them and provide an additional safety
feature. (L. Farley Dep. 17:8; D. Collins Dep. 23:11; E.
Collins Dep. 33:1). Before the accident, Mr. Baisden complained
about the chains being "unsafe," though he does not elaborate on

why he believed this to be so.  (A. Baisden Dep. 102-03, 107-08).

        Turning to the day of the accident, October 24, 2009, Mr. Baisden was manning the operator's side of the cat bolter in the process of "bolting top"; that is, bolting the roof.  (Id. 22:13).  Fellow employee Chris Brown worked the offside.  (C. Brown Dep. 11:19).  Mr. Baisden trammed, or moved, the cat bolter into the No. 2 heading and positioned it to begin putting up bolts.  (Def. Mot., Ex. 9, Foreman's Immediate Report of Accident Resulting in Injury ("Foreman's Report")).  With Brown as his co-operator, plaintiff was driving the bolter from one spot to another at a time when his canopy post had already come up and out and had spun around as they were moving.  (Brown Dep. 21).  When they stopped, the machine was turned off.  At that point, Brown began loading supplies onto the bolter from a scoop while plaintiff set about trying to turn his canopy around.  (Id.).

        In doing so, Baisden moved from the operator's position and reached up and grabbed the upper part of the canopy post with his left hand in an attempt to gain leverage so he could reposition the canopy with his right hand.  (Id. 22:5-

23:3; 25-26; 51).  At the same moment, a piece of draw rock fell from between two bolts and struck Baisden's left thumb.  (Id. 29:18).[4]  According to Brown, when the roof fell on him, Baisden was standing in an area that would not have been covered by the canopy had it remained in its proper place.  (Id. 25:3-22).

As a result of the fall of draw rock, Baisden's thumb was severed at the metacarpophalangeal joint, which resulted in the eventual amputation of his entire left thumb.[5]

The Baisdens instituted this action on February 2, 2011, invoking the court's diversity jurisdiction.  The complaint does not set forth its claims in separate counts.  Even so, the complaint appears to allege three claims: 1) negligence; 2) deliberate intent; and 3) loss of consortium.  (Compl. ¶¶ 10-19).  On November 22, 2011, the parties filed a

---

[4] The details with respect to movements and timing of Mr. Baisden's conduct following overextension of the canopy post are murky.  Mr. Baisden could not remember much of his accident, and the only eyewitness testimony comes from his co-operator Chris Brown.  Even so, Mr. Brown's description of the accident does not paint a clear picture as to plaintiff's precise movements.

[5] "Metacarpophalangeal" relates to the metacarpus (intermediate part of the hand skeleton) and the phalanges (fingers and toes), typically denoting the articulations between them.  Stedman's Medical Dictionary (27th ed. 2000).

voluntary stipulation and agreement to dismiss with prejudice plaintiffs' negligence claim.  Plaintiffs' deliberate intent claim, brought pursuant to West Virginia Code § 23-4-2(d)(2)(ii), remains as the sole basis for liability.  On November 14, 2011, defendant moved for summary judgment.  The motion is now ripe for decision.

II.  Motion for Summary Judgment

A.  Governing Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  <u>Id.</u>  The

9

moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.

Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

B.   Deliberate Intent

The West Virginia Workers' Compensation Act generally immunizes covered employers from employee suits for "damages at common law or by statute" resulting from work-related injuries. W. Va. Code § 23-2-6. This immunity is lost, however, if an employer acts with "deliberate intention." Id. § 23-4-2(d)(2). If the deliberate intent exception applies, the employee may file an action for damages in excess of workers' compensation benefits. Id. § 23-4-2(c).[6]

---

[6] Defendant also asks the court to dismiss plaintiffs' demand for punitive damages. (See Compl. ¶ 20). Inasmuch as

(Cont.).

Subsections (d)(2)(i) and (d)(2)(ii) of § 23-4-2 provide two distinct methods of proving that an employer acted with "deliberate intention."  As noted, plaintiffs' claim is asserted pursuant to § 23-4-2(d)(2)(ii).  Under that provision, employer immunity is lost if the employee proves <u>each</u> of the following five elements:

    (A)   That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

    (B)   That the employer, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;

    (C)   That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation or standard was

_____

punitive damages are plainly not recoverable in deliberate intent actions brought pursuant to § 23-4-2(d)(2)(ii), it is ORDERED that plaintiffs' request for punitive damages be dismissed.  <u>See</u> W. Va. Code § 23-4-2(d)(2)(iii)(A) ("In cases alleging liability under the provisions of paragraph (ii) of this subdivision . . . [n]o punitive damages or exemplary damages shall be awarded to the employee or other plaintiff . . . .").

     specifically applicable to the particular work
and working condition involved, as contrasted
with a statute, rule, regulation or standard
generally requiring safe workplaces, equipment or
working conditions;

  (D) That notwithstanding the existence of the facts
set forth in subparagraphs (A) through (C),
inclusive, of this paragraph, the employer
nevertheless thereafter intentionally exposed an
employee to the specific unsafe working
condition; and

  (E) That the employee exposed suffered serious
compensable injury or compensable death as
defined in section one, article four, chapter
twenty-three whether a claim for benefits under
this chapter is filed or not as a direct and
proximate result of the specific unsafe working
condition.

W. Va. Code §§ 23-4-2(d)(2)(ii)(A)-(E).


    The deliberate intent statute explicitly directs that

"the court shall dismiss the action upon motion for summary

judgment if it finds . . . that one or more of the facts

required to be proved by the provisions of subparagraphs (A)

through (E), inclusive, paragraph (ii) of this subdivision do

not exist." Id. § 23-4-2(d)(2)(iii)(B). "'Thus, in order to

withstand a motion for summary judgment, a plaintiff must make a

prima facie showing of dispute on each of the five factors.'"

Marcus v. Holley, 618 S.E.2d 517, 529 (W. Va. 2005) (quoting

<u>Mumaw v. U.S. Silica Co.</u>, 511 S.E.2d 117, 120 (W. Va. 1998)).
The court considers each statutory requirement in turn.

### 1.   Specific Unsafe Working Condition

To establish the first element of their deliberate
intent claim, plaintiffs must offer evidence identifying "a
specific unsafe working condition" that presented "a high degree
of risk and a strong probability of serious injury or death," as
required by West Virginia Code § 23-4-2(d)(2)(ii)(A).

Plaintiffs principally contend that the use of the
improperly maintained cat bolting machine, which allegedly had a
canopy post with a propensity to overextend, constituted a
specific unsafe working condition.  (Pl. Mem. 5-6).  They also
claim that the cat bolter as modified with chains without the
express consent of the manufacturer was an unsafe working
condition, but they do not explain why this is so.  Defendant
counters by noting that rather than producing a strong
probability of serious injury or death when it welded chains
onto the cat bolter canopy post, the chains in reality served as
an additional safety feature.  The question, then, is whether
plaintiffs have offered sufficient evidence indicating the
existence of an unsafe working condition, namely, that the cat

14

bolter canopy post's propensity to overextend was so unsafe that it presented a strong probability of serious injury or death.

Plaintiffs offer some evidence that the canopy post had overextended at times prior to Mr. Baisden's accident. Floyd Collins, who worked as a roof bolter with Mr. Baisden at the Alpha No. 2 mine, states through deposition testimony, albeit somewhat vaguely, that "[e]very time [Mr. Baisden] picked this canopy up without then [sic, "them"] chains on it, that sucker would come out of there." (F. Collins Dep. 10-11). Mr. Collins, however, does not further describe the nature of such instances or identify when they might have taken place. He added that "[Baisden] always had a habit of pushing his lever up. And it shouldn't have come out anyway, but every time he pushed his lever up, he just wouldn't pay no attention. He'd be doing something else." (F. Collins Dep. 10). Mr. Collins is likely referring to the act of continuing to hold the lever in the "up" position even when the canopy post is raised to its highest point, and that by so doing, the continued increase in hydraulic pressure could sometimes cause overextension of the canopy post.

Robert White, a former roof bolter, and the section boss at Alpha No. 2 at the time of the accident, testified that he had previously observed his canopy post overextended, but that it had occurred "a few years prior" to the accident.[7] (R. White Dep. 14-15). White further testified as follows:

> Q.   And in your case, why did it overextend in your case?
>
> A.   Because I held the lever down too long.
>
> Q.   And why would you do that?
>
> A.   Not paying attention.  I could have been doing two things at one time, raising my canopy and reaching over and getting like a wrench or something like that to put in the pot and not paying attention and just overextended it, is what I did.

(R. White Dep. 17:15-23).

Troubleshooter and electrician Eddie Ray Collins also stated that the cat bolter's canopy post had overextended at times before Mr. Basiden's injury.  (E. Collins Dep. 21:5-8). Also like his fellow workers, he testified that whether and how often the cat bolter canopy overextended normally depended on the conduct of its operator:

---

[7] White noted that he was still working at the Alpha No. 2 mine at the time of his deposition.

16

Q.  Do you remember how frequently [the overextension] would occur?

A.  A lot of it depended on who was running it, too, but it wasn't -- I don't know.  It wasn't no -- you didn't expect that to happen very often.  I don't know if that would give you a better --

Q.  Yes.  I mean, I guess --

A.  That's probably about the most accurate I can answer that.

Q.  And you say it would depend on who's operating it?

A.  Right.

Q.  Was there some individuals who operated the machine where it would overextend more often than with others?

A.  Right.

(Id. at 21-22).  And when asked a second time how often the canopy post overextended, Eddie Ray Collins replied that "it would go months.  I mean, . . . it's liable to be -- liable to do it two days in a row and it might not do it for a long time." (Id. 24).  Moreover, there is no evidence indicating, at any point prior to the accident, that anyone suspected the cat bolter's canopy post bushings, replaceable or permanent, were completely worn.

17

Plaintiffs place a great deal of weight on the fact that defendant, in adding the chains, apparently ignored warnings contained in the roof bolter operator's manual that cautioned against "improper adjustments" and "machine modifications" made without the manufacturer's approval. (Pl.'s Mem. 4-5). Defendant does not dispute that it modified the cat bolter. Rather, defendant provides considerable evidence demonstrating that the modification -- attaching chains to the canopy post -- was undertaken to decrease the possibility of overextension and thereby increase worker safety. Defendant states as follows:

> The purpose of the chains was twofold: first, it would serve as a visual reminder that the canopy was at its maximum height when the chains were taut; second, the chains were intended to add resistance to reduce the chance of the canopy overextending in the event the operator failed to release the lever once the canopy reached its maxim [sic] height.

(Def. Mem. 7 (citing White Dep. 22:1; R. Farley Dep. 36:10, 39:11)). The testimony of J.H. Fletcher President Greg Hinshaw, upon which plaintiffs heavily rely, describes the addition of the chains as a "modification," rather than an "alteration." He testified as follows:

> Q. And would placing the chain be an alteration to that design?

18

A.  It would be a modification to the
design.  Obviously the chain doesn't take
away or replace parts on the machine.  It
adds to, but it would be a modification of
that design.

Q.  And when you say modification, as
opposed to alteration, in your mind, is
there a difference between those two terms?

A.  Only that a modification typically you
think of replacing it with a different part
or modifying the parts provided.

Q.  And then an alteration, as opposed to
alteration, what does that mean?

A.  That's what I mean, if you cut on it or
if you replaced it with a tube of less
structural strength or something like that,
that would be an alteration of the design.
To the extent that if it was welded on in a
place that would affect the material
properties, where those properties were
required to perform its duty, then that
would be an alteration.

(Hinshaw dep. 31:23-32:20).  Understanding the chains to be

a modification rather than an alteration, it is not evident

that their attachment had any impact on the propensity of

the canopy post to extend other than to restrict the

extension.

   While the fact that an equipment modification was

unauthorized may be relevant to the question of the equipment's

modified condition, such evidence alone is not sufficient to

indicate that the equipment was necessarily so unsafe as to present "a high degree of risk and a strong probability of serious injury or death."

Plaintiffs also present the statement that the canopy post, "as designed and maintained, permits the operator to maintain the valve lever in the 'up' position without fear of the canopy over-extending and exposing" the operator to a fall of draw rock. (Pl.'s Mem. 4 (citing Hinshaw Dep. 32-33; 35)). This statement, plaintiff contends, conflicts with various statements of the workers indicating that holding the valve lever in the "up" position -- even when the canopy reaches its maximum height -- can increase the probability of overextension.

Plaintiffs, however, do not dispute that defendant maintained a preventative maintenance schedule of replacing the replaceable bushings every six to nine months. (R. Farley 45:11). In this connection, Baisden's bolting partner Chris Brown testified that defendant both welded the chains to the bolter's canopy posts and replaced the brass bushings the last time the canopy post overextended on his side, facts that further support defendant's stated purpose in attaching the chains. (C. Brown Dep. 17:13). Importantly, as maintenance

employee Eddie Collins testified, the canopy post at the time of the accident "still had the caps and brass in it and it had the chains on it.  You know, it wasn't like the caps and brass wasn't on it.  It would be a different story if that was the case."  (E. Collins Dep. 33:1, 17).

The court cannot say that the potential for the canopy post to overextend did not present an unsafe working condition under certain circumstances.  That is a question of fact presented by the conflicting evidence now before the court and remains to be resolved.  Nevertheless, subsection (A) requires more than a showing that an unsafe working condition could produce an injury.  The unsafe working condition must present a high degree of risk and strong probability of serious injury or death.

In this case, the record indicates that when faced with the prospect of having one of its roof bolters overextend its canopy -- even when caused, at least in part, by operator inattention -- defendant took an additional step to prevent overextension.  Rather than present evidence showing that defendant used the chains as a less expensive substitute instead of replacing worn bushings -- a position plaintiffs suggest but

21

offer no evidence thereof -- plaintiffs present only the
testimony from the equipment manufacturer and sections from the
operator's manual.  While the manufacturer's general applicable
warning stated that "[u]nauthorized modifications could result
in serious injury or death of the operator," such a possibility
does not satisfy the stringent first element of a deliberate
intent action.  Defendant's failure to follow a generally
applicable warning in the operator's manual does not alone
constitute either a sufficient showing of an unsafe working
condition or that such a condition presents a high degree of
risk and strong probability of serious injury or death.

     Moreover, assuming the cat bolter canopy post's
propensity to overextend constituted an unsafe working
condition, the requirement that the condition present a high
degree of risk and strong probability of serious injury or death
is not met for an additional reason.  Here, no evidence
indicates that the overextended canopy post allowed the fall of
draw rock to strike Mr. Baisen's hand while he was at his
position on the operator's platform.  Rather, it was only after
he left the operator's position, climbed up the drill pot and
placed his left hand on the canopy post that the draw rock fell
and crushed his left thumb.  (C. Brown Dep. 25-26; 51).

Plaintiffs simply offer no evidence indicating that an overextended canopy post presents a strong probability of serious injury or death for an operator.  Mr. Baisden's effort to swing the canopy post back around without first shutting down the machine and seeking assistance from a repairman was contrary to established procedure -- a general procedure that evidence shows was largely followed among the deposed coworkers.  See discussion infra part II.B.2.

Had the legislature required a deferential "possibility" or even a "reasonable probability" standard, the outcome here might be different.  For if the lawmakers' inclusion of the adjective "strong" is to have any meaning, it must require plaintiffs to present evidence indicating something considerably more than a mere "possibility" or even a "reasonable probability" of serious injury or death.

Having found that plaintiffs failed to set forth sufficient evidence indicating an unsafe working condition that presented a high degree of risk and strong probability of serious injury or death, there is no genuine dispute of material fact as to the first element of plaintiffs' deliberate intent claim.  Inasmuch as plaintiff has not met one of the four

23

required elements, their deliberate intent claim cannot succeed.
Even so, the court will examine the remaining elements assuming
<u>arguendo</u> that the first element is satisfied.

## 2.  Actual Knowledge

Defendant maintains that it had no "actual knowledge
of the existence of the specific unsafe working condition and of
the high degree of risk and the strong probability of serious
injury or death presented by the specific unsafe working
condition" within the meaning of West Virginia Code § 23-4-
2(d)(2)(ii)(B).

Notably, subsection (B) contains its own two-part
test: the employer must know of both the condition <u>and</u> know that
it presents a "high degree of risk and the strong probability of
serious injury or death."  <u>Id.</u> § 23-4-2(d)(2)(ii)(B).  The
actual knowledge requirement "is not satisfied merely by
evidence that the employer reasonably should have known of the
specific unsafe working condition and of the strong probability
of serious injury or death presented by that condition.
Instead, it must be shown that the employer actually possessed

such knowledge." Syl. pt. 3, <u>Blevins v. Beckley Magnetite,</u>
<u>Inc.</u>, 408 S.E.2d 385 (W. Va. 1991).[8]

"This is a high threshold that cannot be successfully
met by speculation or conjecture." <u>Mumaw v. U.S. Silica Co.</u>,
511 S.E.2d 117, 123 (W. Va. 1998) (per curiam).  Making the
"actual knowledge" determination "requires an interpretation of
the employer's state of mind, and must ordinarily be shown by
circumstantial evidence, from which conflicting inferences may
often reasonably be drawn."  Syl. pt. 2, in part, <u>Nutter v.</u>
<u>Owens-Illinois, Inc.</u>, 550 S.E.2d 398, 399 (W. Va. 2001).

"[T]he type of evidence presented to establish the
requisite subjective knowledge on the part of the employer often
has been presented as evidence of prior similar injuries or of

---

[8] The legislature amended § 23-4-2(d)(2)(ii)(B) in 2005,
substituting the language "[t]hat the employer, prior to the
injury, had <u>actual knowledge</u> of the existence of a specific
unsafe working condition," in the place of "[t]hat the employer
had a <u>subjective realization and appreciation</u> of the existence
of the specific unsafe working condition." <u>Coleman Estate ex</u>
<u>rel. v. R.M. Logging, Inc.</u>, 664 S.E.2d 698, 702 n.7 (W. Va.
2008) (emphasis added).  This change made no practical
difference in interpreting the statute, however, because in
<u>Blevins</u> the West Virginia Supreme Court of Appeals read the
terms "subjective realization" and "appreciation" to require a
showing of "actual knowledge." Syl. Pt. 3, <u>Blevins</u>, 408 S.E.2d
at 385.

prior complaints to the employer regarding the unsafe working condition . . . ." <u>Ryan v. Clonch Indus.</u>, 639 S.E.2d 756, 765 (W. Va. 2006). Indeed, cases addressing the "actual knowledge" requirement have focused on factors such as (1) whether any prior injuries had occurred because of the condition; (2) whether the employer previously had been cited by government officials for the violation; and (3) whether there had been any prior complaints that would have put the employer on notice of the high degree of risk and strong probability of serious injury or death created by the condition. <u>See, e.g.</u>, <u>Blevins</u>, 408 S.E.2d at 391-93 (survey of cases). Yet, "evidence of prior similar incidents or complaints is not mandated by W. Va. Code 23-4-2([d])(2)(ii)." Syl. pt. 2, in part, <u>Nutter</u>, 550 S.E.2d at 399. Finally, the West Virginia Supreme Court of Appeals has further observed that, "[o]bviously, an unsafe condition that develops or first springs into existence close in time to the accident presents less of an opportunity for the employer to realize and appreciate the risk. Thus, [a court's] consideration of the unexpected occurrence of the unsafe working condition [is] merely a part, and a proper part, of its analysis" of the actual knowledge requirement. <u>Deskins v. S.W. Jack Drilling Co.</u>, 600 S.E.2d 237, 243 (W. Va. 2004).

26

Defendant claims that it could not have had actual knowledge of an unsafe working condition inasmuch as it was created by Baisden's disregard of stated and accepted policy procedure; namely, Baisden allegedly created the unsafe working condition when he used his left hand for leverage by grabbing the upper part of the canopy post and used his right hand to swing the canopy around, rather than shutting down the machine and radioing in the repairmen, as defendant's policy directed. Defendant principally relies on Mumaw v. U.S. Silica Co., 511 S.E.2d 117 (W. Va. 1998) (per curiam).

In that case, an employee was injured after falling through an opening when he failed to close the trap door designed to cover the opening despite both his training and obligation to do so. Id. at 123-24. The court concluded that "where an employee creates a specific unsafe working condition by not following expected procedures, a deliberate intention action cannot be maintained against the employer." Id. at 123 (citing the holding in Blevins, 408 S.E.2d at 291). Plaintiffs point to evidence showing that Mr. Baisden complained to several superiors and other workers that the "chains" were unsafe, though without explaining why he believed this to be so. They further assert that under established deliberate intent

27

precedent, "the employer may not assert the employee's
contributory negligence as a defense to such action." Syl. pt.
8, <u>Roberts v. Consolidated Coal Co.</u>, 539 S.E.2d 478 (W. Va.
2000).

        Here, defendant presents uncontroverted evidence that
Alpha's miners were clearly instructed not to work on unsafe or
malfunctioning equipment. Baisden testified regarding his
typical practice, as follows:

                Q.  If you were using either one of the
                bolters and you had a problem with it, what
                was the normal procedure that you followed?

                A.  Tell somebody.

                Q.  Who would you tell?

                A.  Well, the way it's set up we had radios.

                Q.  Okay.

                A.  You holler on the radio, everybody can
                hear you.  The electrician would come up.

(A. Baisden Dep. 50:11).  His fellow miners corroborate this
procedure.  Donald Collins, a fellow miner at Alpha No. 2,
testified that "[t]hey told us, and even [Alpha president] John
Smith told us, if you had a piece of equipment that was faulty,
park it and go get your electrician to fix it."  (D. Collins
Dep. 50:6).  When a canopy post overextended on bolter Chris

28

Brown, who was the co-operator with Baisden at the time of Baisden's injury, he "refused to use it . . . until somebody fixed it." (C. Brown Dep. 33:2). Floyd Collins stated that when he was faced with a canopy that swung around, they would "back up and then go get the electrician to fix it." (F. Collins Dep. 46:2). Marvin Morgan, another co-worker, similarly testified that "[i]f I thought my buggy was unsafe, I would shut it down and get off of it [and] tell my boss and electrician." (M. Morgan Dep. 16:14, 20). Chief electrician Ralph Farley explained that if a canopy comes off of the casing and swings around, the operator should get on the radio and call the electricians and section boss and ask for a repairman. (R. Farley Dep. 60-61).

Instead of following this procedure, which was not only stated by managerial employees but also actually followed by various employees, Baisden, doubtless with good intentions, undertook to try and fix the canopy by climbing onto the drill pot and using his left hand for leverage by grabbing the canopy post and using his right hand to reposition the canopy. (C. Brown Dep. 22:7; 25:14). No evidence indicates that Baisden or his co-operator, Chris Brown, notified the electrician or foreman working at the time before plaintiff moved to resolve it

29

himself.  Indeed, Baisden admitted that he could not have fixed it himself and would have had to call someone.  (A. Baisden Dep. 93:23-94:2; 95-96:5).  As noted above, it was when Baisden moved from the operator's platform and reached up to swing the overextended canopy back into position that his left thumb was injured by the fall of draw rock.

Plaintiffs respond by directing the court to the testimony of Robert White, who stated that while he was working as a roof bolter several years prior to the accident, he managed to fix an overextended canopy by manually rotating the canopy back into place with the assistance of only his bolting partner -- a manner similar to Mr. Baisden's attempt, and in direct contravention to defendant's stated procedures.  (R. White Dep. 29).  Plaintiffs assert that Baisden's action was precisely the type of accepted practice undertaken by White, and therefore, defendant also knew of the unsafe condition and risk caused thereby.  However, no evidence suggests that this practice was widespread, let alone encouraged -- directly or tacitly -- by defendant.  What White did or failed to do in an isolated instance at an unknown date several years before Baisden's accident, and, indeed, before White became a supervisor, is not

30

sufficient to indicate defendant's policies at the time of the accident.

        In addition, plaintiffs concede that no citations were issued with respect to the cat bolter's alleged propensity to overextend.  (Pl.'s Mem. 6-7).  A lack of such evidence is not conclusive, as plaintiffs correctly observe, but it is indicative of their overall failure to present sufficient evidence of actual knowledge.

        Finally, plaintiffs point to evidence indicating that Baisden complained multiple times to several of his superiors that "the chains" were "unsafe."  (A. Baisden Dep. 102-03, 107-08).  Specifically, when he told Ralph Farley that he thought the chains were unsafe, Farley allegedly responded, "Do what you can. Help me out."  (Id. 108:1-11).  Baisden does not explain what he believes Farley meant by this response, though it does not necessarily contradict Farley's own testimony.  That is, when Baisden complained to him about the canopy post, Farley stated that "my response to [Baisden] was that if he feels the bolter is unsafe, park it and get the other roof bolter and operate it, and then we will do whatever we need to do to the cat bolter.  (R. Farley dep. 53).  Moreover, when Baisden was

asked why he thought the chains were unsafe, Baisden explained, "[w]ell, if the chains break, it's going to come out of there." (Baisden dep. 103:14-16).  To be sure, Mr. Baisden's complaint can be construed as indicating a concern with the potential for the canopy post to overextend.  However, beyond this, no evidence shows that defendant was placed on actual notice that the canopy post mechanism used by Baisden was in need of repair or was leaning or was overextending.  Had defendant ignored numerous complaints from other employees, previous similar accidents, or been issued relevant citations by the regulatory authorities, the "actual knowledge" element would likely be satisfied at this stage.  Plaintiffs' general complaint about "the chains" is simply too slender a reed to support a finding that defendant actually knew that the cat bolter was not only likely to overextend but that it presented a "high degree of risk and the strong probability of serious injury or death." Id. § 23-4-2(d)(2)(ii)(B).

It bears emphasizing that evidence showing that the employer reasonably should have known of the specific unsafe condition is not sufficient; only evidence of actual knowledge will do.  As the West Virginia Supreme Court of Appeals has consistently remarked: "At best, the [plaintiffs] might be able

32

to prove ordinary negligence on the part of the [defendant].
However, '[t]he deliberate intention exception to the Workers'
Compensation system is meant to deter the malicious employer,
not to punish the stupid one.'" Deskins, 600 S.E.2d at 243
(quoting Helmick v. Potomac Edison Co., 406 S.E.2d 700, 705 (W.
Va. 1991)).  The court's conclusion that plaintiffs have failed
to present sufficient material evidence of defendant's "actual
knowledge" is buttressed by the stark absence of any facts
showing prior employee complaints from any employees other than
Mr. Baisden, who complained about the chains.  Nor, as noted, is
there any evidence of similar accidents or injuries or any
citations with respect to the cat bolter's canopy post.  In sum,
plaintiffs fall far short of offering sufficient evidence to
satisfy the demanding statutory mandate of "actual knowledge."
See Mumaw, 511 S.E.2d at 123.

     3.   Violation of State or Federal Safety Law or Commonly
               Accepted Safety Standard

          To establish the third element of their deliberate
intention claim, the Baisdens must offer evidence showing that
the alleged specific unsafe working condition violated either
(1) a "state or federal safety statute, rule or regulation" or
(2) a "commonly accepted and well-known safety standard within

33

the industry or business of the employer."   W. Va. Code § 23-4-2(d)(2)(ii)(C).  In either case, the law or standard must have been "specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, or regulation or standard generally requiring safe workplaces, equipment or working conditions."  Id.

Plaintiffs do not contend that defendant violated a commonly accepted and well-known safety standard within the industry or business of the employer.  Rather, plaintiffs claim that defendant's continued use of the allegedly faulty cat bolter constituted a violation of a safety regulation, namely 30 C.F.R. § 75.1725(a), a regulation related to coal mine safety and health.  It states as follows: "Mobile and stationary machinery and equipment shall be maintained in safe operating condition and machinery or equipment in unsafe condition shall be removed from service immediately."  30 C.F.R. 75.1725(a).

The court finds that this provision, in contrast to a regulation "specifically applicable to the particular work and working condition involved," constitutes a "regulation . . . generally requiring safe workplaces, equipment or working conditions," and thus falls outside the scope of § 23-4-

34

2(d)(2)(ii)(C).  <u>Id.</u> § 23-4-2(d)(2)(ii)(C) (emphasis added).
Regarding the purpose of the "specifically applicable"
requirement, Judge Haden has succinctly observed: "To put the
employer on notice, and to evidence its egregious conduct, the
statute or standard must <u>specifically</u> address the unsafe working
condition in question."  <u>Greene v. Carolina Freight Carriers</u>,
663 F. Supp. 112, 115 (S.D. W. Va. 1987) (emphasis in original).
Section 75.1725 is no more than a regulation "generally
requiring" that underground mining equipment be maintained in
safe operating condition.  It is of no aid to the plaintiffs
here.

        In the course of contending that the addition of
chains to the canopy post was an unauthorized modification,
plaintiffs cite 30 C.F.R. § 75.1710-1, which mandates the use of
canopies on underground mining equipment such as the cat bolter.
Section 75.1710-1(a) directs that "canopies . . . [shall be]
installed in such a manner that when the operator is at the
operating controls of such equipment he shall be protected from
falls of roof . . . ."  Plaintiffs simply assert that "[t]he
Defendant[']s unauthorized modification of the machine resulted
in a canopy which was not installed in such a manner that when
the operator is at the operating controls he will be protected

35

from falls of roof, in violation of 30 C.F.R. § 75.1710-1."
(Pl.'s Response at 11).  The chains, however, were an added
safeguard to restrict overextension.  See supra Part II.B.1
(discussing Hinshaw testimony).  The modification was thus not a
violation of § 75.1710-1.

Accordingly, plaintiffs have failed to identify a
genuine issue of material fact as to whether an overextending
canopy post violated a statute, rule, regulation or standard
that was specifically applicable to the particular work and
working condition involved.  No such statute, rule, regulation
or standard is shown.

### 4.  Intentional Exposure

Defendant next contends that there is no evidence that
it "intentionally exposed" Mr. Baisden to a specific unsafe
working condition as required by W. Va. Code § 23-4-
2(d)(2)(ii)(D).

To satisfy the "intentional exposure" requirement,
there "must be some evidence that, with conscious awareness of
the unsafe working condition . . . , an employee was directed to
continue working in that same harmful environment."  Tolley v.

36

ACF Indus., Inc., 575 S.E.2d 158, 168 (W. Va. 2002) (emphasis
added).  "In other words, this element, which is linked
particularly with the subjective realization element [now actual
knowledge], is not satisfied if the exposure of the employee to
the condition was inadvertent or merely negligent."  Sias v. W-P
Coal Co., 408 S.E.2d 321, 327 (W. Va. 1991).  The factor of
conscious awareness has not been shown here.[9]

------------------------------------------------------------

[9] As further explained in Tolley:

This Court has previously discussed what type of
evidence is necessary to meet the fourth prong of the
"deliberate intention" standard.  In Mayles [ v.
Shoney's Inc., 405 S.E.2d 15, 23 (W. Va. 1990)], we
found sufficient evidence was introduced where
"management at the restaurant knew how the employees
were disposing of the grease, knew that a previous
employee had been injured by such practice, had
received employee complaints about the practice, and
still took no action to remedy the situation." . . .
Similarly, in Sias [ v. W-P Coal Co., 408 S.E.2d 321,
327-28 (W. Va. 1991)], we held that the requisite
intentional exposure prong had been met where the
plaintiff produced evidence that his coal employer
directed him to work in an unsafe mining area despite
having actual knowledge of the probability and risk of
a coal outburst in that particular section of the
mine.

Tolley, 575 S.E.2d at 167-68.

      Moreover, as earlier noted, subsection (D) of W. Va. Code § 23-4-2(d)(2)(ii) prescribes as follows:

> D)    That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition. . . .

Inasmuch as none of (A), (B), or (C) has been shown to exist, the defendant cannot be said to have "intentionally thereafter exposed an employee to the specific unsafe working condition." Accordingly, plaintiffs have not established the intentional exposure element of their deliberate intention claim.

### 5.   Proximate Cause

      The final element of plaintiffs' deliberate intention claim requires plaintiffs to show that Mr. Baisden "suffered serious compensable injury . . . as a direct and proximate result of the specific unsafe working condition," W. Va. Code §§ 23-4-2(d)(2)(ii)(E). Defendant does not address this element, and instead relies on the failure of plaintiffs to produce sufficient evidence as to any one of the first four statutory requirements. Inasmuch as neither plaintiffs nor defendant discuss subsection (E), the court declines to address it.

38

In sum, plaintiffs have failed to present material evidence so as to meet any of the first four required statutory elements of a deliberate intent claim.  Inasmuch as plaintiffs must make a sufficient showing on each of the five elements, summary judgment for defendant is granted as to plaintiffs' assertion of deliberate intent.

C.   Loss of Consortium

Plaintiffs' complaint also asserts a loss of consortium claim against defendant.  Inasmuch as this claim is derivative of Mr. Baisden's deliberate intention claim, which has not survived defendant's motion for summary judgment, summary judgment as to this claim must also be granted for defendant.

III.  Conclusion

Based upon the foregoing, the court ORDERS that defendant's motion for summary judgment be, and it hereby is, granted.

The Clerk is directed to transmit copies of this written opinion and order to all counsel of record and any unrepresented parties.

ENTER: January 27, 2012

John T. Copenhaver, Jr.
United States District Judge